**IN THE COURT OF APPEALS OF IOWA**

No. 23-2009
Filed June 18, 2025

**IN THE MATTER OF THE GUARDIANSHIP AND CONSERVATORSHIP OF JOHN ROTTINGHAUS**

**REBECCA HERGERT,**
    Appellant.

_____

Appeal from the Iowa District Court for Black Hawk County, Melissa Anderson-Seeber, Judge.

A daughter appeals a district court order appointing her brother as guardian to their father, setting a visitation schedule, and continuing the guardianship. **AFFIRMED.**

Anne K. Wilson of Anne K. Wilson Law Office, PLLC, Cedar Rapids, and Virginia Wilber of Trent Law Firm, PLLC, Cedar Falls, for appellant.

Charles B. Garman of Duggan Bertsch, LLC, Omaha, Nebraska, for appellee Jason Rottinghaus.

Natalie Williams Burris of Swisher & Cohrt, P.L.C., Waterloo, for protected person.

Considered without oral argument by Schumacher, P.J., and Buller and Langholz, JJ.

**LANGHOLZ, Judge.**

From a pool of exclusively imperfect options, the district court appointed Jason Rottinghaus to serve as guardian to his father, John Rottinghaus. The choice of who should serve as John's guardian—like everything else between John's six children—was contentious. The passed-over sibling, Rebecca Hergert, appeals, arguing the district court abused its discretion by appointing Jason because of his history of obstructing contact between her and John. She also challenges the court's limited visitation schedule. And she alternatively argues that the court should have instead done away with the guardianship.

After carefully reviewing the record, we affirm the district court. When appointing a guardian, the district court was ultimately tasked with acting in John's best interest—not Rebecca's. To that end, we agree with the district court that Jason's years of caregiving and his commitment to John's desire to receive in-home care tips the balance in his favor. So the district court did not abuse its discretion, and we affirm Jason's appointment as successor guardian. We similarly agree that good cause supports the court's limited visitation schedule for the siblings. The recommendations from John's medical providers, the degree of conflict between the siblings, and John's desire to see each of his children all support the court's alternating remote-visit schedule. Finally, we agree with the district court that John continues to be best served by a guardianship.

## I.      Factual Background and Proceedings

John Rottinghaus has six children—Jason, Quentin (who goes by Patrick), Andrew, Teresa, Victor, and Rebecca. In 2018, John executed medical and financial powers of attorney, which named his wife Dessie as his agent and

Rebecca as his successor agent. Around this time, John began showing signs of cognitive decline. And after John's wife passed away in early 2021, five of the siblings (all except Rebecca) believed John's dementia had progressed enough that he could not independently care for himself.

So in March 2021, the five siblings moved to establish a guardianship and conservatorship for John. Rebecca intervened in the action, and the district court temporarily appointed Rebecca and Jason as co-guardians and co-conservators in April. Already, the court observed friction between the siblings and instructed Rebecca and Jason to "put aside" their differences and "work together for the best interest of" John.

That arrangement was short lived. A little over a month later, Jason moved to remove Rebecca as co-guardian and co-conservator, citing "turmoil, passive aggressive behavior," and "discord." Relevant here, Rebecca once took John away from his home, along with his medications and passport,[1] and refused to tell both Jason and John's attorney where they were. Rebecca acknowledged moving John to a hotel with his necessary medical supplies but believed it was necessary after receiving threats from another sibling, Victor. Another time, Rebecca took John on a four-day trip and never monitored his blood sugar, jeopardizing his diabetes care. Beyond these events, Jason also detailed instances where he and Rebecca could not work together to coordinate John's healthcare.

In light of the "contentious and strained relationship between co-guardians and conservators," the court appointed a third-party nonprofit organization—

---

[1] Rebecca primarily resides in Ontario, Canada, though she has a rental property in Waterloo, near John.

Guardians of Northeast Iowa—as temporary guardian and conservator. The court also provided Rebecca with a visitation schedule. A few months later, the case proceeded to a merits hearing, where Rebecca contested the need for a guardianship or conservator. The court ultimately found (1) clear and convincing evidence John met the impairment threshold; and (2) Rebecca's neglectful handling of John's care favored imposing a guardianship and conservatorship. Because of the internal strife between the siblings, the court found John was best served by a third party, so it formally appointed the nonprofit as guardian and conservator in December 2021.[2]

Yet even after the nonprofit took over guardian and conservator duties, the family dynamic did not improve. As the nonprofit's employee assigned to John's guardianship put it, the family was "extremely difficult to work with." The employee received "threatening and insulting" emails and calls from Victor. And she felt Rebecca needlessly questioned her motives and decision-making, habitually threatening legal action when she disagreed with a decision.

A central point of conflict was the frequency of, and her behavior during, Rebecca's visits with John. Jason moved into John's home in May 2021 and became his primary caregiver. After that time, Jason repeatedly prevented Rebecca from visiting with her father.[3] Indeed, when formally appointing the

---

[2] The court also revoked "any previously signed Power of Attorney or Successive Power of Attorney." Because Rebecca does not challenge whether the court had authority to revoke the medical power of attorney when appointing a guardian, we do not address that issue. *But see In re Guardianship & Conservatorship of Zabel*, No. 23-1202, 2025 WL 1452848, at *7 (Iowa Ct. App. May 21, 2025).

[3] Victor at times also kept Rebecca from visiting, once sending an email stating he would not "allow her physical access" to John's home and that "Iowa is a stand your ground state."

nonprofit as guardian, the court emphasized if Jason were guardian, "John would likely not have any contact with [Rebecca] or her family." Yet when Rebecca did have visits, John often experienced stress or disruption afterward. One of the siblings, Patrick, believed Rebecca disregarded medical advice during visits and would press John to recall his children or grandchildren, which would overwhelm or upset him. Patrick's recollection tracks with the nonprofit guardian's decision to suspend visits in the spring of 2023 on the advice of John's medical provider, as his condition sometimes worsened after interacting with multiple people. Rebecca often fought or flouted these visitation restrictions, once showing up to John's house even after she was told she could not visit with him.

After bearing the brunt of the family's discord for nearly two years, the nonprofit moved to withdraw as guardian and conservator in April 2023. The nonprofit represented it was struggling to attend to its other clients because "nearly every decision" resulted in its employees and attorneys being "attack[ed]" and fielding "constant emails and phone calls." Beyond the drain on its resources, the nonprofit also reported receiving threatening and demeaning emails from the family. In response, Rebecca requested that she be appointed as sole guardian and conservator or, in the alternative, that the court terminate the guardianship and conservatorship. Jason requested that he be appointed guardian.

After an evidentiary hearing, the court reaffirmed its prior ruling finding a guardianship appropriate.[4] Because "no other professional third-party guardian would agree to accept the referral," the court was left to choose between Rebecca

---

[4] The court also appointed Fidelity Bank & Trust as successor conservator, and no sibling appeals that appointment.

and Jason. Placing John's needs at the forefront, Jason had been providing daily care to John since May 2021 and has made "extensive sacrifices" for him. Jason also prioritized finding in-home caregivers to protect John's desire to remain at home as long as possible. In the end, "due to the extensive medical needs of John and the excellent care Jason has provided," the court found Jason the better choice. The court also considered visitation, which had been paused since April 2023 on advice of John's healthcare providers. After reviewing an updated letter from one of John's providers, the court authorized a limited visitation schedule for the siblings—giving Rebecca one, twenty-minute virtual meeting every four weeks.

Rebecca unsuccessfully moved to reconsider Jason's appointment and her visitation schedule. And she now appeals.

## II. Successor Guardian

Rebecca first argues the district court erred by appointing Jason as guardian. Rebecca carries a heavy burden to displace the district court's judgment, as we "will not interfere in the selection of a guardian made by a trial court unless it is shown that there has been a clear abuse of discretion in making the appointment." *Arent v. Arent*, 32 N.W.2d 660, 661 (Iowa 1948). "A district court abuses its discretion when its ruling is based on clearly untenable grounds." *In re Guardianship of J.W.*, 991 N.W.2d 143, 150 (Iowa 2023) (cleaned up). When choosing between multiple qualified persons, the district court must discern "which proposed guardian's appointment would best serve the interests and well-being of the" protected person. *In re Guardianship of Turner*, No. 18-1361, 2019 WL 3945973, at *4 (Iowa Ct. App. Aug. 21, 2019).

We agree with the district court that appointing Jason furthers John's best interest in two key respects. First, all agree John desires to remain in his home as long as possible. Jason has worked to ensure John receives in-home care, often stepping in to provide care when nurses or other aides cancel last minute. Rebecca, conversely, wished to move John into a local facility, which she believed would be a "neutral" location and allow her and her family to visit more often. Yet as the district court noted, Rebecca's desire to alter John's daily environment is contrary to "what the medical professionals have said about John's need for routine and consistency." And we agree that her approach stems not from John's best interest, but her own desires for more visitation and less sibling interaction.

Second, it is undisputed Jason has taken excellent care of John since moving into John's home in May 2021. Indeed, Jason left his employment so he could care for John full time, at great financial sacrifice. John's dementia is consistently monitored, his diabetes has stabilized, and Jason takes an active role in managing John's care across various providers. Appointing Jason as guardian provides consistency to John and avoids a needless disruption in his care.

True, as Rebecca urges, appointing Jason does perpetuate conflict during her visits. And unfortunately, her concern that Jason may obstruct her visits is well founded. But the frequency of Rebecca's visitation is just one factor among many informing the court's ultimate decision. And we agree that it does not overcome the other factors supporting Jason's appointment. Nor are we moved by Rebecca's appeal to John's 2018 financial power of attorney, which she argues shows John's intent that she serve as guardian. That document contained a section where John could nominate one or more persons to be "guardian of [his]

8

person" should "it become necessary," and John nominated no one. So it too does not overcome the district court's informed discretion.

At bottom, the district court observed the siblings from the start of this case, with a front-row seat to much of the dysfunction. Across its rulings, the court placed John's needs first—it initially kept Rebecca as a co-guardian to provide John with consistency, it appointed a neutral third-party when the siblings proved unable to work together, and it repeatedly prioritized John's health over the competing desires of the siblings. And after the siblings drove out the nonprofit guardian, the court was left to choose between two imperfect options. In choosing Jason, the district court appropriately considered John's best interest. Seeing no abuse of discretion, we thus affirm the appointment of Jason as successor guardian.

## III.    Visitation

Rebecca next asks us to "remand for hearing to allow more liberal visitation between John and all his children." Generally, a guardian is empowered to oversee the protected person's "relationships and interactions" with "family members and significant other persons." Iowa Code § 633.635(2)(i) (2021). The guardian must make "reasonable efforts to identify and facilitate" those relationships and interactions, but "may place reasonable time, place, or manner restrictions on communication, visitation, or interaction between the adult protected person and another person" unless a court orders otherwise. *Id.* "A court shall approve the denial of all communication, visitation, or interaction with

another person only upon a showing of good cause by the guardian." *Id.* § 633.635(3)(c).

In late March 2023, John was taken to the emergency room after experiencing short-term loss of consciousness. The treating provider opined "it is in the best interest for the patient that he is allowed to rest with minimal interactions with outsiders beyond the caregiving team" until he could be assessed by his neurologist. Two weeks later, his neurologist "recommend[ed] that visitors and patient care be limited to essential care givers only indefinitely for patient's mental and physical wellbeing given his advanced dementia." As a result, the nonprofit guardian ended family visits.

In June, the court requested an updated and more detailed report from John's medical provider. The neurologist wrote a letter to the court explaining that the recommended visitor restriction was based in part on John's condition and in part on reports from Jason and the nonprofit that John's visits with some family members were "distressing for [John] and impact his mood and behavior for several days." The neurologist cautioned that he had not "personally observed these interactions," so he could not "attest to what degree they are impacting" John. But the neurologist stressed a "focus" of caring for patients with advanced dementia is ensuring their comfort and safety.

After reviewing the updated letter, Rebecca's request for visitation, and a statement from John's attorney that he wishes to see his children, the court lifted the complete bar on visitation. First, the court found Jason "unable and unwilling to objectively view his father's interactions with Rebecca," so some structure from the court was warranted. Second, the letter from the neurologist did "not have any

supporting facts from which the doctor based his recommendation," undermining the medical necessity of the complete bar. And third, John "wants to see his children in the twilight of his life." Balancing all these factors, the court found a weekly virtual visit with one child was in John's best interest.

Rebecca's argument on appeal largely turns on Jason's likelihood of obstructing her visits. But the court anticipated that possibility, and we believe the mandatory schedule provides her with adequate recourse should Jason defy his obligation to facilitate John's relationship with Rebecca. What's more, her position that there was "nearly no evidence" supporting the schedule ignores the multiple medical providers that recommended limited deviations from John's daily routine and interactions. And given the degree of conflict between the siblings, we believe remote, single-child visits are appropriately tailored to reduce any negative impacts on John's health. Thus, good cause supports the court's visitation schedule.

## IV. Terminating the Guardianship

Finally, Rebecca argues the court should have done away with the guardianship and conservatorship rather than appoint Jason as successor guardian.[5] A court must terminate a guardianship if it finds that it is "no longer

---

[5] Jason contests error preservation, arguing Rebecca is improperly challenging the unappealed 2021 ruling imposing the guardianship and conservatorship. But the district court understood Rebecca's response to the nonprofit guardian's withdrawal as contesting the ongoing need for the guardianship. The court then arguably ruled on that request, briefly noting that it "continues to find that a guardian is necessary for John." Assuming without deciding that Rebecca's request to terminate the guardianship was sufficiently presented below, we elect to reach the merits. But the court made no similar finding on the continued need for a conservatorship. Nor did it rule on any request to reinstate John's 2018 powers of attorney. And Rebecca's rule 1.904(2) motion did not seek a ruling on either issue. So those issues are not properly before us. *Bank of Am., N.A. v. Schulte*, 843 N.W.2d 876, 883–84 (Iowa 2014).

necessary." Iowa Code § 633.675(1)(c); *see also id.* § 633.552(1)(a)–(b) (allowing court to appoint a guardian if the protected person's "decision-making capacity" is sufficiently impaired and a guardian "is in the best interest" of the protected person). We generally review the court's decision whether to terminate a guardianship de novo. *See In re Guardianship of B.J.P.,* 613 N.W.2d 670, 672 (Iowa 2000); Iowa Code § 633.33.

In 2021, the district court issued a thorough ruling finding that a guardianship was necessary and in John's best interest. Rebecca's renewed request during the successor-guardian proceedings offered no new evidence suggesting that John's circumstances had changed or otherwise undermining the district court's prior ruling. Instead, she summarily rehashed—as she does on appeal—her belief that she alone should manage her father's affairs because Jason is unfit. In light of Rebecca's prior conduct while caring for John and our finding that Jason is an appropriate guardian, we see no basis to disturb the district court's finding that a guardianship is necessary for, and best serves, John. Thus, we affirm.

**AFFIRMED.**